NMA:NS
F. #2016R01322

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – –X

UNITED STATES OF AMERICA

      - against -                          Docket No. <u>17–CR 280 (KAM)</u>

EUGENIO PEREZ,

              Defendant.

– – – – – – – – – – – – – – – – –X


## <u>MEMORANDUM OF LAW IN SUPPORT OF PRETRIAL DETENTION</u>

BRIDGET M. ROHDE
ACTING UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Nicole M. Argentieri
Marisa M. Seifan
Nadia I. Shihata
Assistant U.S. Attorneys
     (Of Counsel)

## PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in support of pretrial detention of the defendant EUGENIO PEREZ.  On May 24, 2017, a grand jury in the Eastern District of New York returned a 16-count sealed indictment charging the defendant with (1) three counts of deprivation of civil rights under color of law, in violation of 18 U.S.C. § 242; (2) three counts of aggravated sexual abuse, in violation of 18 U.S.C. § 2241(a)(1); (3) three counts of sexual abuse, in violation of 18 U.S.C. § 2242(1); (4) four counts of sexual abuse of a ward and one count of attempted sexual abuse of a ward, in violation of 18 U.S.C. § 2243(b); and (5) one count of abusive sexual contact, in violation of 18 U.S.C. § 2244(a)(4).  The charges in the indictment involve five separate victims.  The aggravated sexual abuse and related civil rights charges constitute crimes of violence for which the defendant faces up to life imprisonment.  The defendant also faces a maximum sentence of life imprisonment on the sexual abuse charges and a maximum sentence of 15 years' imprisonment on each of the sexual abuse of a ward charges.  In light of the nature and seriousness of the charges and the length of the sentence the defendant faces, the defendant poses a danger to the community and a risk of flight and should be detained pending trial.

## LEGAL STANDARD

I.    Bail Reform Act

Under the Bail Reform Act, 18 U.S.C. § 3141, et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight.  See 18 U.S.C. § 3142(e).  A finding of dangerousness must be supported by clear and convincing evidence.  See United

States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985).  A finding of risk of flight must be supported by a preponderance of the evidence.  See United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); Chimurenga, 760 F.2d at 405.

 The Bail Reform Act lists four factors a court should consider in the detention analysis: (1) the nature and circumstances of the crimes charged, (2) the history and characteristics of the defendant, (3) the seriousness of the danger posed by the defendant's release and (4) the evidence of the defendant's guilt.  See 18 U.S.C. § 3142(g).  Evidentiary rules do not apply at detention hearings and the government is entitled to present evidence by way of proffer, among other means.  See 18 U.S.C. § 3142(f)(2); see also United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (government entitled to proceed by proffer in detention hearings); Ferranti, 66 F.3d at 542 (same); United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986) (same).  As the Second Circuit has explained:

> [I]n the pre-trial context, few detention hearings involve live testimony or cross examination.  Most proceed on proffers.  See United States v. LaFontaine, 210 F.3d 125, 131 (2d Cir. 2000).  This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery."  United States v. Acevedo-Ramos, 755 F.2d 203, 206 (1st Cir. 1985) (Breyer, J.) (quoted approvingly in LaFontaine, 210 F.3d at 131).  Indeed, § 3142(f)(2)(B) expressly states that the Federal Rules of Evidence do not apply at bail hearings; thus, courts often base detention decisions on hearsay evidence.  Id.

United States v. Abuhamra, 389 F.3d 309, 320 n.7 (2d Cir. 2004).

II. Elaborate Bail Packages Are Insufficient to Protect the Community Against Violent Defendants

 The Second Circuit repeatedly has rejected "elaborate" bail packages for dangerous defendants.  See Ferranti, 66 F.3d at 543-44 (rejecting $1 million bail package

secured by real property); United States v. Orena, 986 F.2d 628, 630-33 (2d Cir. 1993)

(rejecting $3 million bail package secured with real property, home detention, restricted

visitation and telephone calls, and electronic monitoring); United States v. Colombo, 777

F.2d 96, 97, 100 (2d Cir. 1985) (rejecting $500,000 bail package secured by real property).

The Second Circuit has viewed home detention and electronic monitoring as insufficient to

protect the community against dangerous individuals.  In United States v. Millan, the Second

Circuit held that:

> Home detention and electronic monitoring at best elaborately
> replicate a detention facility without the confidence of security
> such a facility instills.  If the government does not provide staff
> to monitor compliance extensively, protection of the community
> would be left largely to the word of [the defendants] that [they]
> will obey the conditions.

4 F.3d 1039, 1048-49 (2d Cir. 1993) (citations and internal quotations omitted).  See also

Orena, 986 F.2d at 632 ("electronic surveillance systems can be circumvented by the

wonders of science and of sophisticated electronic technology") (internal quotation marks and

citations omitted).

Similarly, courts in this district have denied dangerous defendants bail in

recognition of the Second Circuit's dim view of the effectiveness of home detention and

electronic monitoring.  See, e.g., United States v. Cantarella, 2002 WL 31946862, at *3-4

(E.D.N.Y. 2002) (Garaufis, J.) (adopting "principle" of "den[ying] bail to 'dangerous'

defendants despite the availability of home detention and electronic surveillance and

notwithstanding the value of a defendant's proposed bail package"); United States v.

Agnello, 101 F. Supp. 2d 108, 116 (E.D.N.Y. 2000) (Gershon, J.) ("[T]he protection of the

community provided by the proposed home detention remains inferior to that provided by

confinement in a detention facility[.]"); United States v. Masotto, 811 F. Supp. 878, 884

(E.D.N.Y. 1993) (rejecting bail because "the Second Circuit appears to be saying to us that in

the case of 'dangerous defendants' the Bail Reform Act does not contemplate the type of

conditions suggested by this Court [including home confinement and electronic monitoring]

and that, even if it did, the conditions would not protect the public or the community, given

the ease with which many of them may be circumvented").

      Finally, courts in this district have remanded law enforcement defendants on

dangerousness grounds in cases where they used their positions as law enforcement officers

to commit violent crimes, finding that the nature of the charges themselves were a sufficient

basis for detention.  See United States v. Besnik Llakatura, Criminal Docket No. 13-668

(ENV), ECF Docket No. 30 (Transcript of December 6, 2013 Bail Hearing before the

Honorable Cheryl Pollak) at 16 (finding that NYPD officer defendant was a danger to the

community "based on the nature of the charges," which were "serious extortion charges

involving very serious threats of violence, coupled with the use of a firearm [by a

codefendant], regardless of who carried it" and noting that the defendant was "not just your

average defendant," but rather "a police officer who has a position of trust in the

community"); United States v. Jose Tejada, Criminal Docket No. 08-242 (SLT), ECF Docket

No. 724 (Transcript of April 4, 2013 Detention Hearing before the Honorable Marilyn Go) at

22 (entering permanent order of detention against NYPD officer defendant charged with

Hobbs Act robberies committed years earlier finding that the charges in the indictment were

"very disturbing" and noting that the defendant engaged in them while "in the uniform of a

police officer").

ARGUMENT

Detailed below is a proffer of the relevant facts in support of the government's position with respect to the pretrial detention of the defendant. LaFontaine, 210 F.3d at 130-31 (government entitled to proceed by proffer in detention hearings).

I.      Proffered Facts Regarding the Defendant's Crimes

The charges in the indictment stem from the defendant's conduct over a period of three years during which the defendant used his position as a United States Bureau of Prisons Lieutenant assigned to the Metropolitan Detention Center in Brooklyn, New York ("MDC") to engage in sexual acts and contact with five female inmates who were detained at the MDC and under the defendant's supervisory and disciplinary authority. His victims are identified in the indictment as "Jane Doe #1" through "Jane Doe #5." That conduct involved the use of physical force against Jane Doe #1 and Jane Doe #2, as well as threatening and placing Jane Doe #1, Jane Doe #2, and Jane Doe #4 in fear to cause each of them to engage in sexual acts with him.

Notably, at the time of the defendant's crimes, he was an active-duty Lieutenant at the MDC, with supervisory authority over other correctional officers and supervisory and disciplinary authority over inmates.   More specifically, as a Lieutenant, the defendant had responsibility for (1) operational aspects of the Correctional Department and supervision of correctional officers assigned to given areas of the MDC; (2) providing day-to-day counseling of subordinates and resolving work-related problems; (3) evaluating the performance of subordinates; (4) maintaining order between both officers and inmates; and (5) handling disciplinary matters.   As a Lieutenant, the defendant was also responsible for conducting rounds at the MDC to identify and deter staff sexual abuse and sexual

5

harassment.  According to his performance reviews and witness testimony, the defendant was also involved in educating MDC staff regarding the Prison Rape Elimination Act ("PREA") protocols and incidents, demonstrating a particularly brazen and deliberate willingness to transgress the oath he swore to uphold as a federal law enforcement officer through his serious criminal conduct.

A.  Jane Doe #1 and Jane Doe #2

While Jane Doe #1 was housed in the MDC's Special Housing Unit ("SHU"), the defendant visited Jane Doe #1 and advised her that he intended to discard the "write-up" Jane Doe #1 had received, which would allow Jane Doe #1 to leave the SHU and return to her regular housing unit.  The defendant told Jane Doe #1, however, that she would have to do extra cleaning duty as a result.

On or about the evening of September 2, 2016 – the day after Jane Doe #1's release from the SHU – the defendant came to Jane Doe #1's unit and, while there, reminded Jane Doe #1 that she had "extra duty" to do.  Later that night, the defendant returned to the unit and escorted Jane Doe #1 and Jane Doe #2 to the second floor of the MDC's East Building, specifically to an area outside the Lieutenants' Office with a sofa and two bathrooms, for cleaning.

While cleaning an area outside the Lieutenants' Office, the defendant made certain comments to Jane Doe #1, indicating, in substance and in part, that he had "saved [her] ass" from the SHU.  Thereafter, Jane Doe #1 began cleaning one of the bathrooms.  The defendant followed Jane Doe #1 into the bathroom and, among other things, grabbed the front of Jane Doe #1's neck and proceeded to grab her breasts, warning Jane Doe #1 not to "piss [him] off," when she pushed his hand away.  Thereafter, Jane Doe #2 – who had been

6

cleaning the other bathroom – proceeded towards the entrance of the bathroom that Jane Doe #1 and the defendant were in, whereupon, the defendant grabbed Jane Doe #2's arm, and pulled Jane Doe #2 closer to him. After making various comments to Jane Doe #1 and Jane Doe #2, including threatening that he could make their lives easy or difficult, the defendant roughly inserted his fingers into Jane Doe #1's vagina. Thereafter, the defendant exposed his penis and instructed Jane Doe #2 to perform oral sex on him. The defendant grabbed Jane Doe #2's neck and hair and shoved Jane Doe #2's face towards his penis and inserted his penis inside Jane Doe #2's mouth. The defendant then instructed Jane Doe #1 to perform oral sex on him as well, inserting his penis into Jane Doe #1's mouth. Thereafter, the defendant ejaculated in a unique manner described consistently by both Jane Doe #1 and Jane Doe #2. The defendant warned Jane Doe #1 and Jane Doe #2, in substance and in part, not to tell anyone what had transpired and that, if they did, they would "be sorry" and no one would believe them because he was a Lieutenant. The following morning, the defendant returned to Jane Doe #1 and Jane Doe #2's unit. Jane Doe #2 encountered the defendant in the hallway outside the unit, whereupon the defendant asked her, in substance and in part, if she "want[ed] some more" and again admonished her not to say anything.

Jane Doe #1 described the defendant's penis in a manner consistent with the results of a search warrant to examine the defendant's penis executed during the course of this investigation.

B. Jane Doe #3

During her stay at the MDC, Jane Doe #3 was housed in the MDC's East Building and frequently exercised in an area known as the "recreation deck." On multiple

occasions, the defendant watched Jane Doe #3 while she exercised on the recreation deck and commented on her appearance.

In or about May or June of 2016, in the evening hours, Jane Doe #3 and another female inmate were escorted to the Lieutenants' Office area on the second floor by an MDC officer (hereinafter, "MDC Officer #1"). The defendant was in the Lieutenants' Office area upon their arrival. Thereafter, MDC Officer #1 left the area.

While Jane Doe #3 was cleaning an area outside the Lieutenants' Office, the defendant told Jane Doe #3 to enter the Lieutenants' Office, which she did. The defendant and Jane Doe #3 were alone in the Lieutenants' Office at this time. The defendant grabbed Jane Doe #3 by the arm and wanted to touch her. Jane Doe #3 told the defendant, in substance and in part, "no" and that she was afraid. The defendant told Jane Doe #3, in substance and in part, not to be afraid, that he was in control and was able to monitor surveillance footage on a computer in the office to see if anyone was coming, and that the other female inmate who had accompanied Jane Doe #3 to the second floor had since returned to her unit. While inside the Lieutenants' Office, among other things, the defendant exposed his penis to Jane Doe #3 and masturbated in front of Jane Doe #3, telling her to watch. The defendant ultimately ejaculated in a unique manner described by Jane Doe #3, which is consistent with the manner in which he ejaculated during the incident with Jane Doe #1 and Jane Doe #2. During this encounter in the Lieutenants' Office, the defendant also, inter alia, asked Jane Doe #3 to touch his penis, touched Jane Doe #3's breasts over her clothing, and instructed Jane Doe #3 to turn around and squeezed her buttocks over her clothing. At the end of this encounter, the defendant told Jane Doe #3, in substance and in

part, not to tell anyone what had transpired, so that neither Jane Doe #3 nor the defendant would get in any trouble.

On an evening in or about mid-July 2016, Jane Doe #3 encountered the defendant on the recreation deck. The defendant informed Jane Doe #3 that he would send for her later that evening to clean "downstairs." Later that night, an MDC officer (hereinafter, "MDC Officer #2") escorted Jane Doe #3 and another female inmate to the Lieutenants' Office area on the second floor. After escorting Jane Doe #3 and the other female inmate to the Lieutenants' Office area, MDC Officer #2 left Jane Doe #3 and the other female inmate with the defendant and left the area. Thereafter, the defendant called Jane Doe #3 into the Lieutenants' Office, while the other female inmate remained outside cleaning.

Upon her entry into the Lieutenants' office, the defendant grabbed Jane Doe #3, lifted her shirt and her brassiere, and lowered her pants. Thereafter, the defendant touched Jane Doe #3's breasts and then physically turned Jane Doe #3 around and made her bend forward, grabbing Jane Doe #3's buttocks and sticking his finger inside her buttocks. The defendant then attempted to insert his penis into Jane Doe #3's buttocks, but Jane Doe #3 clenched her muscles. The defendant then instructed Jane Doe #3, in sum and substance, to relax. Jane Doe #3 told the defendant, in sum and substance, "no" and that she was afraid. The defendant then lifted Jane Doe #3 up and instructed Jane Doe #3 to perform oral sex on him, which she did. While the defendant's penis was inside Jane Doe #3's mouth, the defendant used his hands to push Jane Doe #3's head forward in order to put his penis more fully inside her mouth, which made Jane Doe #3 feel like she wanted to throw up. At some point, the defendant called out to the other female inmate as Jane Doe #3 performed oral sex

9

on him and asked her to come inside the Lieutenants' Office and watch. Thereafter, the

defendant ejaculated in a unique manner, consistent with the manner described by Jane Doe

#1 and Jane Doe #2 in relation to the September 2, 2016 incident. Following this encounter,

the defendant told Jane Doe #3 and the other female inmate not to tell anyone about what had

transpired.

Jane Doe #3 has also described the defendant's penis in a manner consistent

with the results of a search warrant to examine the defendant's penis executed during the

course of this investigation.

C. Jane Doe #4

On an evening in or about April 2016, a correctional officer escorted Jane Doe

#4 and another female inmate (hereinafter, "the Female Inmate") to clean the Lieutenant's

Office on the second floor and left Jane Doe #4 and the Female Inmate with the defendant.

After their arrival, Jane Doe #4 began cleaning areas outside the Lieutenant's Office, while

the Female Inmate was inside the Lieutenant's Office with the defendant.

While the Female Inmate was inside the Lieutenants' Office, the defendant,

seated at his desk, asked the Female Inmate whether she knew his nickname and proceeded

to stand up and walk towards the Female Inmate, exposing his penis and telling the Female

Inmate to observe his penis so as to understand his nickname. The defendant further

commented on the length of his penis, grabbed the Female Inmate's hand in an effort to

make her touch his penis, and asked her to give him oral sex. The Female Inmate's hand

touched the defendant's penis briefly, but she was able to get her hand away and ultimately

left the Lieutenants' Office to clean another part of the second floor. After leaving, the

Female Inmate told Jane Doe #4 to clean the Lieutenants' Office.

Jane Doe #4 entered the Lieutenants' Office and thereafter observed the defendant with his penis exposed. Jane Doe #4 was surprised and terrified at that moment. The defendant then proceeded to tell Jane Doe #4 information about herself, including her scheduled release date and further suggested that he had reviewed her medical records. Jane Doe #4 was intimidated by the defendant because he knew personal information about her that she had not shared with him herself. The defendant subsequently instructed Jane Doe #4 to give him oral sex, which she did. Because the defendant was a lieutenant with the power to give her a disciplinary infraction known as a "shot," Jane Doe #4 was afraid that, if she refused, she could be taken to the SHU or that she could lose her "good time," and thus her release date would be postponed. While his penis was in Jane Doe #4's mouth, the defendant put his hands behind Jane Doe #4's head and forced his penis deeper into her mouth, so much so that she choked. Jane Doe #4 unsuccessfully tried to push her head away from the defendant's penis but was unable to do so due to the pressure he exerted on the back of her head with his hands.

At some point while the defendant had his penis inside Jane Doe #4's mouth, the Female Inmate came back to the Lieutenants' Office. Among other things, the defendant asked the Female Inmate to expose parts of her body to him. Eventually, the defendant ejaculated in a unique manner, consistent with the manner described by Jane Doe #1, Jane Doe #2 and Jane Doe #3. The defendant instructed Jane Doe #4 and the Female Inmate, in substance and in part, not to say anything about what had transpired so as not to get "in trouble."

D. Jane Doe #5

While Jane Doe #5 was housed at the MDC, the defendant made comments to her complimenting her appearance. In or about 2013, Jane Doe #5 was informed by an MDC officer that the defendant wanted her to clean for him. The officer then escorted Jane Doe #5 to the Lieutenants' Office area and then left. Jane Doe #5 proceeded to clean an area outside the Lieutenants' Office and then proceeded to clean an area within the Lieutenants' Office. While Jane Doe #5 was inside the Lieutenants' Office, the defendant kissed Jane Doe #5 on her mouth and fondled her breasts over her clothing. The defendant then exposed his penis for Jane Doe #5 to perform oral sex on him. The defendant's penis had a foul odor and Jane Doe #5 did not want to perform oral sex on the defendant, so she made a joke, laughed it off, and then left the room. Jane Doe #5 did not feel safe in the Lieutenants' Office with the defendant. Jane Doe #5 has described the defendant's penis in a manner consistent with the results of a search warrant to examine the defendant's penis executed during the course of this investigation.

II.   The Defendant Constitutes A Danger to the Community and Should Be Detained

As set forth below, each of the § 3142(g) factors demonstrates by clear and convincing evidence that the defendant is a danger to the community and should be detained.

A.   The Nature and Circumstances of the Crimes Charged

As set forth above, the defendant is charged with serious crimes of violence punishable by a term of imprisonment of up to life in prison. See 18 U.S.C. §§ 3142(g)(1) and 3156(a)(4)(A) (defining a "crime of violence" as an offense that has as one of its elements the "use, attempted use, or threatened use of physical force against the person or property of another"). The nature and circumstances of the charged crimes are particularly

12

egregious given the defendant's status as a Lieutenant at the MDC, with supervisory

responsibilities over his fellow staff members and inmates under his care, custody and

control.  A facts underlying the charges in the indictment show a disturbing course of

conduct by a Lieutenant who brazenly abused his position of trust and authority to engage

and attempt to engage in sexual acts over a period of years with five separate female

prisoners, including through the use of force and fear.  The defendant literally used the

trappings of his position to commit the charged crimes at night in areas where security

cameras were nonexistent or not working (information which, as a Lieutenant, he was privy

to).  With all of his victims, the defendant used the same modus operandi: luring his victims

to the Lieutenants' Office area through the promise of a cleaning detail before, inter alia,

exposing his penis in a manner consistently described by each victim, instructing his victims

to perform oral sex on him (often using force and fear while doing so), ejaculating in a

unique manner consistently described by each of his victims, and threatening his victims not

to tell anyone or they would face unwelcome consequences.  What emerges from this

disturbing pattern is the picture of a man with no respect for the oath he swore to uphold as a

federal law enforcement officer.[1]  Put simply, the nature and circumstances of the charged

crimes, which were committed with impunity over a period of years, by a defendant whose

official responsibilities included protecting female inmates from harm, is egregious and alone

---

[1]     See 5 U.S.C. § 3331 (setting forth oath for individuals "appointed to an office of honor or profit in the civil service or uniformed services," which includes an oath to "support and defend the Constitution of the United States" and to "faithfully discharge the duties" of the individual's office); 28 C.F.R. § 0.151 (authorizing, inter alia, the Director of the Bureau of Prisons to designate "officers or employees to administer the oath of office required by section 3331 of title 5").

demonstrate by clear and convincing evidence that the defendant is a danger to the community and should be detained.

B.   The History and Characteristics of the Defendant and Seriousness of the Danger Posed by the Defendant's Release

While the defendant has no prior criminal record, as described above, the underlying criminal conduct charged in the indictment was not an isolated incident caused by a momentary lapse in judgment, but rather a sustained and deliberate pattern of conduct that occurred over a period of years without detection. Emboldened by his authority and the lack of any real consequences for his conduct, the defendant repeatedly and flagrantly ignored his sworn duty as a federal correctional officer to uphold the law and protect the prisoners under his authority and control. He also used fear to prevent his victims from coming forward. This conduct over a period of years is strong evidence that the defendant is likely to attempt witness tampering or other obstructive conduct if released, a factor relevant to an assessment of the seriousness of the danger posed by the defendant's release.

C.   The Evidence of the Defendant's Guilt

The government's evidence of the defendant's guilt as to the charged crimes, which are charged by indictment, is strong. The government will prove the charged crimes at trial through, among other evidence, the testimony of victims and other witnesses, video surveillance footage from the MDC, the results of the search warrant executed on the defendant, which corroborates victim testimony, MDC records and other documentary evidence. Moreover, as described above, the witness testimony at trial will reveal a distinctive pattern and modus operandi, including from witnesses incarcerated at the MDC at different times who do not know each other, further buttressing the strength of the evidence

14

against the defendant.  As to most of the charged sexual incidents, the government expects to present at trial the testimony of two direct eye-witnesses, in some cases victims.  The government's evidence is therefore exceedingly strong and clearly favors detention.

III.    The Case Also Involves a Serious Risk of Flight and Obstruction of Justice

        In addition to the facts set forth above, the defendant constitutes a flight risk due to the lengthy prison term he faces.  Based on the charges in the indictment, the defendant faces a maximum term of life imprisonment.  The government currently estimates that the defendant's sentencing range under the United States Sentencing Guidelines will be between 235 to 293 months (i.e., between 19.5 and 24.4 years).  The likelihood of such a lengthy sentence provides a strong motive for the defendant to flee (as well as to obstruct justice), especially in light of the strength of the evidence in this case.  See United States v. Dodge, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (finding the possibility of a "severe sentence" heightens the risk of flight).  In addition, the defendant has demonstrated that he is prone to obstruct justice through his efforts to intimidate and scare his victims into silence to prevent his criminal conduct from coming to light.

        As a result, the government has demonstrated by a preponderance of the evidence that, if released, there is a serious risk that the defendant will flee or attempt to obstruct justice.  See 18 U.S.C. § 3142(f)(2); United States v. Madoff, 586 F. Supp. 2d 240, 247 (S.D.N.Y. 2009) (preponderance of evidence standard applies to determination of both risk of flight and risk of obstruction of justice).

CONCLUSION

For the foregoing reasons, the government respectfully submits that the

defendant should be detained pending trial.

Dated:      Brooklyn, New York
            May 25, 2017

                                    Respectfully submitted,

                                    BRIDGET M. ROHDE
                                    ACTING UNITED STATES ATTORNEY
                                    Eastern District of New York
                                    Attorney for Plaintiff
                                    271 Cadman Plaza East
                                    Brooklyn, New York 11201


                        By:         _____/s/_____
                                    Nicole Argentieri
                                    Marisa Seifan
                                    Nadia Shihata
                                    Assistant United States Attorneys
                                    (718) 254-7000